# EXHIBIT 6



ISS Special Situations Research

Research Note

August 26, 2020

# 58.com Inc. (WUBA): Proposed Take-Private by Quantum Bloom

| | |
|---|---|
| Record Date | Aug. 10 (ADS) / Aug. 14 (shares) |
| Meeting Date | September 7, 2020 |

## Vote Recommendation: Vote AGAINST proposed transaction

### Executive Summary

In 2015 and 2016 investors saw a rash of Chinese take-privates for the purpose of delisting companies from US exchanges and relisting elsewhere. These transactions generally offered shareholders consideration that was a premium to the market price but a fraction of the company's expected value once it moved to its new exchange.

It remains to be seen whether the current political and market environment will lead to a resumption of that trend. In the proposed acquisition of 58.com, shareholders have another example of a transaction in which the consideration is at a premium to market and yet does not seem sufficient to be compelling.

Quantum Bloom, an investment vehicle that that owns 14.99 percent of the company's shares and controls 44.0 percent of the voting power, is affiliated with 58.com's chairman and CEO, Jinbo Yao. Under the terms of the agreement, shareholders will receive $28.00 per share ($56.00 per ADS) in cash.

Tencent Holdings (22.4 percent, 28.3 percent voting), while not a member of the buyer group and not bound by a voting agreement, has the contractual right to roll over its shares in the company. Because the shareholder approval threshold is two-thirds of all votes, and the combination of the buyer group and Tencent's shares exceed that amount, approval of the transaction appears to be a foregone conclusion.

The process that led to the buyer group's offer was flawed and the result of that process is questionable. The value offered to shareholders is out of sync with the company's historical valuation relative to peers and likely does not provide a control premium to the company's intrinsic value. Management's projections indicate that the company has a promising future as a stand-alone entity, such that there is little apparent downside risk to voting against the transaction. As a result, support for the transaction is not warranted.



Chart Focus: WUBA ADS price

Source: Bloomberg LP

### Contacts

David Spindler
David.Spindler@issgovernance.com

Cristiano Guerra
Cristiano.Guerra@issgovernance.com

Heath Winter
Heath.Winter@issgovernance.com

Special Situations Research delivers comprehensive, independent research on high-profile economic proposals including M&A and proxy contests, and on the implications for shareholders of evolving trends in corporate governance and shareholder rights.

© 2020 All Rights Reserved. Institutional Shareholder Services Inc. | www.issgovernance.com


**ISS Special Situations Research**

Research Note

*August 26, 2020*

### PARTIES TO THE TRANSACTION

**58.com Inc.** is a provider of online classified advertisements for the China market.

**Quantum Bloom Company, Ltd.** is a Cayman Islands-domiciled corporation and the investment vehicle of the buyer group, whose principal members include Jinbo Yao, Warburg Pincus, General Atlantic, and Ocean Link.

**Tencent** (22.4 percent, 28.3 percent voting) is the company's largest shareholder outside the buyer group. Tencent is not bound by a voting agreement but has a contractual right to roll over its shares into an equivalent number of Quantum Bloom shares.

Shareholders are entitled to appraisal rights in the Cayman Islands. ADS holders are not entitled to appraisal rights.

### SALES PROCESS

On March 24, 2020, the company engaged Kaihui Limited as a consultant to explore potential strategic transactions. The following day, Kaihui began working with Warburg Pincus, a prior investor in the company. On April 2, Kaihui contacted a second private equity firm, Ocean Link. That evening, Ocean Link submitted to the board a preliminary non-binding proposal letter, in which it proposed to acquire all of the outstanding shares of the company for $27.50 in cash per share, or $55.00 per ADS, a premium of 19.9 percent to the last closing price on April 1 (New York time; all subsequent dates except the final deal announcement are in Beijing time).

Between April 3 and April 13, the company discussed how it should respond to the proposal, including calling a meeting of the board. On April 13, the company announced the resignation of Frank Lin, an independent director with a ten-year tenure, and the appointment of Li (Lily) Dong and Robert Dodds, Jr. as independent directors. One week later, the board formed a special committee composed of Dong and Dodds to evaluate the proposal. On April 27, the special committee hired financial and legal advisors.

On April 28, the company's chairman and CEO, Jinbo Yao (10.2 percent beneficial, 42.0 percent voting) joined the buyer group, which again conveyed a $27.50 per share proposal to the company. In May, the special committee determined not to undergo a market check or reach out to other buyers, partly because of Yao's voting power.

During the first two weeks of June, the parties exchanged draft merger agreements. The special committee's drafts did not include a minimum cash level for the company at handover or limits on the number of shares that could seek dissenters' rights and proposed a requirement that the transaction be approved by a majority of unaffiliated shareholders and a termination fee of 1.5 percent of the total equity value of the company and a 3.0 percent reverse termination fee. The buyer group's drafts included a minimum cash level, limits on the number of shares that could exercise dissenters' rights, no requirement for approval by a majority of unaffiliated shareholders and a termination fee and reverse termination fee of 1.0 and 2.0 percent of the company's total equity value, respectively.

On June 9, Tencent, holder of 22.3 percent of the company's shares and 28.3 percent of its voting power, announced that it would not join the buyer group or execute a voting agreement.

Between June 10 and June 15, the parties also discussed price. On June 14, the buyer group proposed a $0.30 increase to $56.30 per ADS, which the special committee rejected. Late the next day, the parties agreed on a price increase of $1.00 to $56.00 per ADS, no dissenters' rights limitation or majority of the unaffiliated requirement, and a 1.5 percent termination and 3.0 percent reverse termination fee.

The transaction was announced before the start of trading in New York on June 15th.

### ISS ANALYSIS

*Flawed Process*

There appear to be no operational reasons for the company's decision to seek strategic alternatives, as its prospects as a stand-alone entity were promising. In fact, management projections indicate a revenue CAGR through 2025 of 13.6 percent and unlevered free cash flow CAGR of 7.8 percent. The company's competitive position in the domestic Chinese classifieds market is strong, given that its rivals are predominantly smaller companies. The board found that the transaction is preferable to remaining independent and pursuing the company's strategic plan, but there is limited support provided for that conclusion.

Based on the above, there was no apparent reason behind the company's decision to engage Kaihui to explore a strategic transaction other than to effect a take-private transaction. The day after Kaihui was hired, it contacted Warburg Pincus, a former investor



ISS Special Situations Research

Research Note

August 26, 2020

in the company. Just a week after it formalized the engagement with WUBA, Kaihui contacted Ocean Link, as the company explains, "in light of its prior take-private experiences."

After receiving an initial offer from Warburg Pincus and Ocean Link on April 2, the board appeared to take no action over the next ten days other than to consider whether to call a board meeting. Frank Lin, a disinterested director with a ten-year tenure on the board, announced his resignation on April 13. On the same day, the company announced the appointment of Dong and Dodds, then one week later appointed them as sole members of the special committee. The circumstances of Lin's resignation and the appointments of Dong and Dodds, and relationships of the latter two, if any, to company insiders have not been disclosed by the company.

Surprisingly, on certain occasions, the special committee treated Kaihui as its advisor and agent in negotiations with the buyer group. One such instance was on June 5, when the special committee discussed with Kaihui the "position to be taken and approach to be followed in negotiating the price with the buyer group." Treating Kaihui as an advisor is questionable because it was hired by the same company management that subsequently proposed the transaction. In this June 5 conversation, Kaihui conveyed to the special committee the buyer group's comments relating to price, including US-China tensions, competitive pressures on the company, anticipated declines in gross margins, and the effect of COVID-19 on the company. In so doing, Kaihui effectively represented the buyer group's interests at the same time that it was advising the special committee about its negotiation approach. On June 10, the special committee again discussed its price negotiation approach with Kaihui and its advisors, after which Kaihui discussed the purchase price with the buyer group, presumably at the behest of the special committee.

The special committee argues that the voting power of Yao is a reason for not electing to conduct a market check or include "go-shop" provisions in the merger agreement and is also a reason that they were not able to extract more favorable terms from the buyer group. The special committee does not explain in detail whether it seriously considered exercising its exclusive power, granted to it by the board, to reject the buyer group's offer (and any other offer).

Finally, it should be noted that not until late on June 10 did the special committee raise the possibility with the buyer group of a per ADS price higher than the group's original offer of $55.00. Instead of emphasizing price in the negotiations, the special committee focused most of its negotiation efforts on dissenters' rights, majority of the minority rights, termination fees, and the buyer group's demand for a minimum cash condition. Not until June 15 was the special committee able to secure the buyer group's agreement to a per ADS price above $55.00, in the form of an increase of $1.00 to $56.00 per ADS.

Due to the lack of an explanation for the viability of the standalone case, the late addition of board members to form a special committee, the special committee's reliance upon an advisor selected by the buyer, and the low priority apparently assigned to maximizing the transaction price, shareholders cannot be certain that the sale process has resulted in the best outcome.

### Tencent Rollover

This transaction is subject to approval by an affirmative vote of shareholders representing at least two-thirds of the shares voted at the meeting. The buyer group shareholders, who in aggregate own approximately 44.0 percent of the company's voting power, have agreed to vote in favor of the deal.

Tencent is not bound by a voting agreement and is not formally part of the buyer group. However, it can opt to participate in the ownership of Quantum Bloom by voting for the transaction, rolling over its approximately 67.3 million shares of 58.com, and paying the par value of $0.00001 per share. While Tencent's intentions have not been explicitly stated, the buyer group's calculation of the funds needed to complete the transaction indicates that it expects Tencent will roll over its shares (see Financing section below). When Tencent's voting power of 28.3 percent is added to the buyer group's voting power of 44.0 percent, the combined 72.3 percent comfortably exceeds the two-thirds majority of votes needed to approve the transaction.

In light of Tencent's low cost for the rollover relative to the potential gains for Quantum Bloom shareholders, and in consideration of the buyer group's assumption that it will not need cash to purchase Tencent's shares, it appears likely that Tencent will support the transaction. Approval of the transaction therefore appears to be a foregone conclusion.



ISS Special Situations Research

Research Note

August 26, 2020

*Comparable Transaction*

The fairness opinion states that the company's financial advisor could not find a meaningful implied valuation range based on comparable transactions because there were no relevant transactions that had both public financial information and were consummated prior to COVID-19. Subsequent to the transaction's announcement, international classifieds operator Adevinta announced the acquisition of eBay's classifieds business for $9.2 billion. That business generated $996 million of revenue in 2019, implying that Adevinta acquired eBay's classifieds business at a value equal to 9.24x 2019 revenue. A similar valuation for 58.com's business, based on 2019 reported revenue, would lead to a transaction at $68 per share, or $136 per ADS. Bearing in mind that i) this is a single example, ii) eBay's classifieds serve mature North American and European markets rather than 58.com's Chinese markets, and iii) 58.com had 18.6 percent revenue growth in 2019 in contrast to eBay classified's 5.8 percent decline, this is a datapoint that indicates the 58.com transaction price may be below the company's actual market value.

| Comparison of 58.com and eBay classified Transaction Multiples | |
|---|---:|
| 58.com 2019 total revenue (USD thousands) | $ 2,232,809 |
| Weighted average number of ordinary shares | 301,449,100 |
| | |
| eBay Classified acquisition price | $ 9,200,000 |
| eBay Classified 2019 revenue | $ 996,000 |
| eBay Classified revenue multiple | 9.24x |
| | |
| Implied 58.com transaction Value at eBay multiple | $ 20,624,340 |
| Implied 58.com per share value at eBay multiple | $68.42 |
| Agreed 58.com per share transaction price* | $28.00 |
| Agreed price discount to implied price | (59)% |

*Total Shareholder Return*

Comparisons were made among the total shareholder return for the company, a median of peers, and a relevant index. The company's peer group comprises 51job (JOBS), Autohome (ATHM), Bitauto Holding (BITA), Domain Holdings (DHG.AU), REA Group (REA.AU), SEEK Limited (SEK.AU), and Wise Talent Information Technology (6100.HK); the benchmark index is the CSI Overseas China Internet Index (H11137).

As reflected in the table, in the year leading up to the unaffected date WUBA shares underperformed the median of the company's peers by 4 percentage points. WUBA underperformed the CSI Overseas China Internet Index by 23.4 percentage points, though it bears mentioning that the median of its peers also missed the benchmark. When the analysis is extended past the unaffected date, WUBA's TSR improves from being down 30 percent since April 1, 2019 to only being down 16.7 percent. However, the 13.4 percentage point improvement in WUBA's total shareholder return, which includes the benefit of the acquisition's takeover premium, is outstripped by the 27.7 percentage point gain in the median of the company's peers and the 49.2 percentage point increase in the total shareholder return of the benchmark index.

This analysis implies that if the transaction had not been announced, and if WUBA shares' price movement since April 1, 2020 had matched the median of its peers, WUBA ADSs would presently be trading at $64.13, a 10.6 percent premium to the agreed transaction price.

| Total Shareholder Return | One-Year | |
|---|---:|---:|
| | Through Unaff. Date | Extended Through |
| | 4/1/2020 | 8/19/2020 |
| 58.Com Inc | -30.1% | -16.7% |
| Peer Median | -26.1% | 1.6% |
| CSI Overseas China Internet Index | -6.7% | 42.5% |
| | | |
| 58.Com Inc B/(W) | | |
| Peer Median | (4.0) | (18.3) |
| CSI Overseas China Internet Index | (23.4) | (59.2) |

*Source: Bloomberg Financial L.P. Peers include 51Job Inc-Adr, Autohome Inc-Adr, Bitauto Holdings Ltd-Adr, Domain Holdings Australia Lt, Rea Group Ltd, Seek Ltd, Tongdao Liepin Group.*

*Trading Multiples*

Since 2015, shareholders of companies that are listed in the US or Canada but operate in China have been particularly wary of go-private proposals that offer a premium to "market" but are, in reality, a significant discount to intrinsic value – whether measured by multiples, growth profile, or some other meaningful indication of the company's current and future business prospects. The question of whether to sell, which is the central issue in every merger proposal, becomes particularly acute in these cases, and can rarely be answered simply by looking at the premium to market. To assess the historical relative valuation of the company, comparisons were made between the Price / Free Cash Flow multiple and EV / EBITDAe (estimated EBITDA) multiple trends for the company, a median of the same peer group, and the S&P 500 Information Technology Index.

As reflected in the tables below, in the year leading



ISS Special Situations Research

Research Note

August 26, 2020

up to the unaffected date the company's median P/FCF multiple was 15.9x, a 31.2 percent discount to the median of peers and a 23.8 percent discount to the median of the S&P 500 Information Technology Index. Its median EV/EBITDAe multiple was 15.4x, a 22.9 percent discount to peers but a 9.4 percent premium to the benchmark index. Following the announcement of the transaction, WUBA lost ground to the median of its peers and the index. The median P/FCF discount to peers increased by 5.5 percentage points, the discount of WUBA's P/FCF multiple relative to the index increased by 5.6 percentage points, the company's EV/EBITDAe discount to its peer median worsened by 3.8 percentage points, and the EV/EBITDAe discount to the index grew by 10.7 percentage points. As with the TSR, this underperformance occurred in spite of the transaction's premium.

| P / FCF Multiple | One-Year | |
|---|---|---|
| | Through Unaff. Date 4/1/2020 | Extended Through 8/19/2020 |
| 58.Com Inc | 15.9x | 15.0x |
| Peer Median | 23.2x | 23.7x |
| S&P 500 Information Technology Index | 20.9x | 21.2x |
| 58.Com Inc Premium/(Discount) | | |
| Peer Median | (31.2)% | (36.7)% |
| S&P 500 Information Technology Index | (23.8)% | (29.3)% |

Source: Bloomberg Financial L.P. Peers include 51Job Inc-Adr, Autohome Inc-Adr, Bitauto Holdings Ltd-Adr, Domain Holdings Australia Lt, Rea Group Ltd, Seek Ltd, Tongdao Liepin Group.

This analysis implies that if the transaction had not been announced, and if WUBA shares' P/FCF multiple since April 1, 2020 had remained in line with its historical relationship to the median of its peers, WUBA ADSs would presently be trading at $67.00, a 15.5 percent premium to the agreed transaction price. Similar analysis of the EV/EBITDAe multiple produces an implied, ex-transaction value of $71.93 per ADS.

| EV / EBITDAe Multiple | One-Year | |
|---|---|---|
| | Through Unaff. Date 4/1/2020 | Extended Through 8/19/2020 |
| 58.Com Inc | 15.4x | 14.3x |
| Peer Median | 19.9x | 19.6x |
| S&P 500 Information Technology Index | 14.0x | 14.5x |
| 58.Com Inc Premium/(Discount) | | |
| Peer Median | (22.9)% | (26.7)% |
| S&P 500 Information Technology Index | 9.4% | (1.4)% |

Source: Bloomberg Financial L.P. Peers include 51Job Inc-Adr, Autohome Inc-Adr, Bitauto Holdings Ltd-Adr, Domain Holdings Australia Lt, Rea Group Ltd, Seek Ltd, Tongdao Liepin Group.

### Financing

The buyer group expects that the $5.85 billion in funds needed to complete the transaction will be derived from the following funding sources:

| Funding source | Amount (million USD) |
|---|---|
| Buyer group cash contributions | $ 2,950.00 |
| Senior term loan facility from Shanghai Pudong Development Bank | $ 2,000.00 |
| Cash held by company and subsidiaries* | $ 900.00 |
| **Total:** | **$ 5,850.00** |

*Presumed cash needed to reach stated total funding needs.*

Shanghai Pudong Development Bank is also providing a total of $1.5 billion in bridge loans with terms of six to 24 months. The buyer group's equity contribution is 50.4 percent of the estimated total transaction value.

The buyer group appears to have calculated its financing needs based on the assumption that Tencent would roll over its shares. As the table below demonstrates, the aggregate transaction value is approximately $5.7 billion, provided Tencent rolls over its shares. The $5.85 billion of funds raised by the buyer group are insufficient to complete the transaction if Tencent does not roll over its shares.

| Funding Use | Amount (million USD) |
|---|---|
| Total funds raised | $ 5,850.00 |
| Less: Transaction costs | $ 87.86 |
| Equals: Expected transaction amount | $ 5,762.14 |
| Less: Payout of vested options and restricted share units | $ 74.00 |
| Less: Purchase of GA SPV I ADSs | $ 400.40 |
| Equals: Funds available for purchase of unaffiliated shares | $ 5,286.29 |
| Maximum number of shares that can be purchased with funds available (million) | 188.80 |
| Shares not held by buyer group (million) | 255.27 |
| Excess shares for which funds are not available (million) | 66.47 |
| Shares owned by Tencent (million) | 67.29 |

As the above table indicates, the shares owned by Tencent approximate the number of shares that the buyer group's funding plan appears not to take into account.

Shareholders should note that the $8.7 billion figure mentioned in the company's announcement of the transaction refers to the equity value of the entire company as implied by the transaction's terms.



ISS Special Situations Research

Research Note

August 26, 2020

## CONCLUSION

Take-private transactions that include members of a company's management team should draw more scrutiny from investors than arm's-length transactions due to the heightened risks of conflicts of interest. Insiders and management teams have access to extensive non-public information and a great deal of negotiating power, which places third parties at a disadvantage and may discourage alternate bids that would otherwise offer a higher value to unaffiliated shareholders. Though a board can and should structure a process to mitigate some of these investor concerns, such as by appointing a Special Committee of disinterested directors to run a thorough auction process, the principal-agent conflicts inherent to such transactions will likely never be fully addressed.

Shareholders of companies operating in China and listed in the U.S. should also be mindful of the need of these issuers to relist on non-U.S. stock exchanges due to the possibility that the SEC will eventually disallow listings by firms whose auditors cannot be inspected by the PCAOB. Take-private transactions by these firms may be driven less by market conditions than the need to seek more amenable listing jurisdictions.

An assessment of WUBA's total share return, price to free cash flow multiple, and enterprise value to EBITDA multiple, relative to peers and benchmark indices, indicate that the transaction price is below a value that warrants support. Efforts to assess the hypothetical value of shares in the absence of a transaction by examining peers and indices must rely on a number of assumptions. None of the individual estimated hypothetical values can be accepted as a price at which WUBA could definitively be expected to trade. However, the uniformity of the result, the historical share return, P/FCF multiples, and EV/EBITDAe multiples all indicate a price well above the proposed transaction price, and support a conclusion that the transaction's value is not sufficient.

The process that led to the buyer group's offer was flawed and the result of that process is questionable. The value offered to shareholders is out of sync with the company's historical valuation relative to peers and it likely does not provide a control premium to the company's intrinsic value. Management's projections indicate that the company has a promising future as a stand-alone entity, such that there is little apparent downside risk to voting against the transaction. As a result, support for the transaction is not warranted.

\*           \*           \*

We will continue to monitor this situation and market trends, speak with interested parties and, where relevant, issue additional *Special Situations Research* notes to provide further information and guidance for clients.



**ISS Special Situations Research**

Research Note

*August 26, 2020*

# Transaction Summary

| Parties to the Transaction | Target | Acquirer |
|---|---|---|
| Company: | 58.com Inc. | Quantum Bloom Company, Ltd |
| Ticker: | WUBA | Private |

| Valuation | |
|---|---|
| Transaction Terms: | $28.00 per share or $56.00 per ADS |
| Type of Consideration: | Cash |
| Equity Value: | $8.7 billion* |
| Premium at Announcement: | 12.4% |
| Premium to 2-months Prior to Announcement: | 7.9% |
| Premium to Unaffected Date** (April 1, 2020): | 19.9% |
| Premium to 2-months Prior to Unaffected Date: | (2.7)% |

*Equity value of entire company as implied by transaction.
**On April 2, 2020, 58.com issued a press release regarding its receipt of a non-binding acquisition proposal.

| Process | |
|---|---|
| *Announcement Date:* | June 15, 2020 |
| *Unaffected Date:* | April 1, 2020 |
| *Sales Process:* | No Auction |
| *Board Level of Support:* | Unanimous |
| *Special Committee:* | Yes |
| *Reasons for the Special Committee:* | Chairman/CEO, a large shareholder, involved in the buyout |
| *Special Committee Level of Support:* | Unanimous |

## Transaction Summary (continued)

| Market Context | WUBA | Quantum Bloom Company, Ltd | CSI China Overseas Internet Index | S&P 500 |
|---|---|---|---|---|
| *Price Change at Announcement (1-day):* | 9.6% | N/A | 1.4% | 0.8% |
| *From Day Prior to Announcement through August 19, 2020:* | 11.7% | N/A | 19.7% | 11.0% |
| *1-day Price Change relative to unaffected date (Apr. 1, 2020):* | 13.0% | N/A | 0.8% | 2.3% |
| *From Unaffected to August 19, 2020:* | 19.2% | N/A | 52.7% | 36.6% |

| Deal Structure | Target | Acquirer |
|---|---|---|
| *Termination Fee:* | $126.4 million (1.5% of implied equity value) | $252.8 million (2.9% of implied equity value) |
| *% Ownership of Combined Company:* | 0% | 100% |
| *Number of Board Seats, Combined Company:* | 0% | 100% |
| *Voting Agreement* | Yes | N/D |
| *Committed Shares (% of outstanding):* | 44.0% | N/D |

| Fairness Opinion | Target | Acquirer |
|---|---|---|
| *Fairness Opinion:* | Yes | N/D |
| *Financial Advisor:* | Houlihan Lokey | N/D |
| *Total Transaction Fee:* | $1,250,000 | N/D |
| *Contingent Portion:* | $50,000 | N/D |



**ISS Special Situations Research**

Research Note

*August 26, 2020*



ISS Special Situations Research
Research Note
*August 26, 2020*

## Historical Financial Performance

**58.Com Inc**

| | FY 2019 | FY 2018 | FY 2017 | FY 2016 | FY 2015 | FY 2014 | Five-Year CAGR |
|---|---:|---:|---:|---:|---:|---:|---:|
| | 12/31/2019 | 12/31/2018 | 12/31/2017 | 12/31/2016 | 12/31/2015 | 12/31/2014 | |
| | (RMB mils) | (RMB mils) | (RMB mils) | (RMB mils) | (RMB mils) | (RMB mils) | |
| Market Cap | 9,679 | 8,031 | 10,486 | 4,052 | 9,183 | 3,648 | 21.5 % |
| **Income Statement** | | | | | | | |
| Revenue | 15,577 | 13,138 | 10,069 | 7,592 | 4,493 | 1,633 | 57.0 % |
| COGS | 1,798 | 1,438 | 925 | 707 | 322 | 85 | 84.0 % |
| SG&A | 8,867 | 7,611 | 5,978 | 5,543 | 4,991 | 1,237 | 48.3 % |
| EBITDA | 3,411 | 2,800 | 2,232 | 641 | (1,375) | 76 | 114.2 % |
| Adjusted EBITDA | 3,424 | 2,837 | 2,270 | 812 | (1,153) | 76 | 114.2 % |
| Operating Income | 2,852 | 2,387 | 1,796 | 234 | (1,583) | 41 | 133.4 % |
| Net Income | 8,278 | 1,997 | 1,285 | (784) | (1,577) | 140 | 126.3 % |
| EPS (Adjusted) | 49 | 14 | 9 | (5) | (18) | 2 | 98.3 % |
| **Balance Sheet** | | | | | | | |
| Cash & ST Investments | 13,778 | 6,975 | 4,963 | 2,034 | 3,403 | 2,033 | 46.6 % |
| Total Debt | 276 | 813 | 852 | 1,993 | 1,784 | - | |
| Shareholder's Equity | 35,009 | 24,261 | 21,552 | 17,852 | 18,307 | 3,149 | 61.9 % |
| **Cash Flow** | | | | | | | |
| Operating Cash Flow | 4,354 | 3,800 | 2,780 | 1,888 | 68 | 607 | 48.3 % |
| Capex | (117) | (184) | (121) | (213) | (1,228) | (200) | (10.2)% |
| Free Cash Flow | 4,238 | 3,616 | 2,659 | 1,675 | (1,161) | 407 | 59.7 % |
| **Margins and Return Ratios** | | | | | | | **Change (ppt)** |
| Gross Margin | 88.5 % | 89.1 % | 90.8 % | 90.7 % | 92.8 % | 94.8 % | (6.3) |
| EBITDA Margin | 21.9 % | 21.3 % | 22.2 % | 8.4 % | (30.6)% | 4.6 % | 17.3 |
| Adjusted EBITDA Margin | 22.0 % | 21.6 % | 22.5 % | 10.7 % | (25.7)% | 4.7 % | 17.3 |
| Operating Margin | 18.3 % | 18.2 % | 17.8 % | 3.1 % | (35.2)% | 2.5 % | 15.8 |
| Return on Assets | 22.0 % | 6.6 % | 4.8 % | (3.0)% | (10.5)% | 4.4 % | 17.7 |
| Return on Common Equity | 31.3 % | 9.6 % | 6.9 % | (4.4)% | (15.1)% | 6.2 % | 25.0 |
| Return on Invested Capital | 8.4 % | 8.7 % | 7.6 % | 0.1 % | (13.8)% | 1.4 % | 7.0 |

*Source: Bloomberg Finance LP*



## ISS Special Situations Research

Research Note

*August 26, 2020*

## Shareholder Base

**58.Com Inc**

|   | | Ownership Stake | | | |
|---|---|---|---|---|---|
|   | | **Shares** | **Pct O/S** | **Filing** | **Date** | **Investor Type** |
| 1 | Nihao China Corp | 14,709,320 | 11.6% | 13G | 12/31/19 | Other |
| 2 | T Rowe Price | 8,669,738 | 6.8% | ULT-AGG | 6/30/20 | Investment Advisor |
| 3 | Standard Life Aberdeen | 7,366,966 | 5.8% | 13F | 6/30/20 | Insurance Company |
| 4 | Genesis Asset Managers | 7,171,327 | 5.6% | 13G | 6/30/19 | Investment Advisor |
| 5 | General Atlantic | 7,150,000 | 5.6% | 13F | 6/30/20 | Private Equity |
| 6 | Farallon Capital | 4,965,212 | 3.9% | ULT-AGG | 6/30/20 | Hedge Fund Manager |
| 7 | Pentwater Capital | 4,942,800 | 3.9% | 13F | 6/30/20 | Hedge Fund Manager |
| 8 | Blackrock | 4,518,500 | 3.6% | ULT-AGG | 6/30/20 | Investment Advisor |
| 9 | Tencent Holdings | 4,384,207 | 3.4% | 13D | 6/15/20 | Corporation |
| 10 | Vanguard | 3,551,858 | 2.8% | ULT-AGG | 6/30/20 | Investment Advisor |
| 11 | Ninety One UK | 3,092,779 | 2.4% | 13F | 3/31/20 | Investment Advisor |
| 12 | State Street | 1,863,334 | 1.5% | ULT-AGG | 6/30/20 | Investment Advisor |
| 13 | Davis Selected Advisers | 1,821,925 | 1.4% | 13F | 6/30/20 | Investment Advisor |
| 14 | Alpine Associates | 1,717,400 | 1.4% | 13F | 6/30/20 | Investment Advisor |
| 15 | Renaissance Technologies | 1,516,412 | 1.2% | 13F | 6/30/20 | Hedge Fund Manager |
| 16 | Baillie Gifford & Co | 1,454,059 | 1.1% | 13F | 6/30/20 | Investment Advisor |
| 17 | Government Pension Investment Fund | 1,451,551 | 1.1% | MF-AGG | 3/31/20 | Sovereign Wealth Fund |
| 18 | BNP Paribas | 1,370,056 | 1.1% | ULT-AGG | 6/30/20 | Investment Advisor |
| 19 | Wellington | 1,360,509 | 1.1% | 13F | 6/30/20 | Investment Advisor |
| 20 | Norges Bank | 1,348,509 | 1.1% | 13F | 12/31/19 | Sovereign Wealth Fund |
|   |   | **84,426,462** | **66.3%** | | | |

*Source: Bloomberg Financial LP*

The issuer that is the subject of this analysis may have purchased self-assessment tools and publications from ISS Corporate Solutions, Inc. (formerly known as ISS Corporate Services, Inc. and referred to as "ICS"), a wholly-owned subsidiary of ISS, or ICS may have provided advisory or analytical services to the issuer in connection with the proxies described in this report. These tools and services may have utilized preliminary peer groups generated by ISS' institutional research group. No employee of ICS played a role in the preparation of this report. If you are an ISS institutional client, you may inquire about any issuer's use of products and services from ICS by emailing disclosure@issgovernance.com.

This proxy analysis and vote recommendation has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. While ISS exercised due care in compiling this analysis, it makes no warranty, express or implied, regarding the accuracy, completeness or usefulness of this information and assumes no liability with respect to the consequences of relying on this information for investment or other purposes. In particular, the research and voting recommendations provided are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies.

ISS is an independent company owned by entities affiliated with Genstar Capital ("Genstar").  ISS and Genstar have established policies and procedures to restrict the involvement of Genstar and any of Genstar's employees in the content of ISS' analyses.  Neither Genstar nor their employees are informed of the contents of any of ISS' analyses or recommendations prior to their publication or dissemination. More information is available at https://www.issgovernance.com/compliance/due-diligence-materials/.

The issuer that is the subject of this proxy analysis may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS.

One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS or ICS, or the parent of, or affiliated with, a client of ISS or ICS. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS may in some circumstances afford issuers, whether or not they are clients of ICS, the right to review draft research analyses so that factual inaccuracies may be corrected before the report and recommendations are finalized. Control of research analyses and voting recommendations remains, at all times, with ISS.

ISS makes its proxy voting policy formation process and summary proxy voting policies readily available to issuers, investors and others on its public website: http://www.issgovernance.com/policy.

- - -

Copyright © 2020 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or redisseminated in whole or in part without prior written permission from ISS.



## The Global Leader in Corporate Governance

Founded in 1985, the Institutional Shareholder Services group of companies ("ISS") empowers investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight. With nearly 2,000 employees spread across 30 U.S. and international locations, ISS is today the world's leading provider of corporate governance and responsible investment solutions, market intelligence and fund services, and events and editorial content for institutional investors and corporations, globally.

For more information, please visit: www.issgovernance.com